# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**WARREN PINK,**

      **Petitioner,**

**v.**                            **Case No. 8:18-cv-1984-MSS-CPT**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

      **Respondent.**
_____/

## O R D E R

Pink petitions for the writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for attempted second-degree murder, aggravated battery, and fleeing to elude a law enforcement officer, for which he is serving 25 years in prison. After reviewing the amended petition (Doc. 5), the response and appendix (Docs. 14 and 15), and the reply (Doc. 18), the Court **DENIES** the petition.

### PROCEDURAL HISTORY

The evidence at trial showed that Pink shot and wounded Delroy Dyer in a nail salon in Tampa, Florida. Pink entered the nail salon, approached Dyer, who was sitting down, yelled profanities at him, and pointed his mobile telephone at Dyer in anger. Dyer stood up unarmed and faced Pink. A woman at the salon tried to intervene but moved out of the way when Pink pulled out a gun from his waistband. Pink shot Dyer behind his left shoulder just as Dyer started to turn away. The bullet also struck another woman at the salon in the neck and arm. Witnesses at the salon heard Pink yell at Dyer, "Stay away from my girl!"

1

Both Dyer and Pink each fathered a child with Deneice Ramsay. Earlier that day, Dyer offered Ramsay money for their child. Pink had driven to the nail salon with Ramsay. When Pink left the salon wielding a gun, a police officer ordered Pink to stop but Pink disobeyed the command and drove away with Ramsay in the vehicle. The police officer followed Pink in a marked police car with her emergency lights on and sirens blaring. As a chase ensued, Pink threw the gun that he used to shoot Dyer out the window. After Ramsay continued to scream, Pink pulled over and surrendered to police.

Pink testified that Dyer had repeatedly called him and threatened to kill him during the months before the shooting. Pink's relationship with Ramsay angered Dyer. Pink had seen Dyer carry a gun and learned that people in the Jamaican community knew that Dyer was violent and regularly carried a gun. Because of the death threats and Dyer's reputation, Pink broke up with Ramsay and started carrying his own gun.

On the day of the shooting, Pink, Ramsay, Ramsay's child, and Ramsay's babysitter drove to the fish market. Ramsay's babysitter purchased fish at the market. Pink saw his cousin's daughter inside the nail salon next door and walked into the salon to speak with her. Dyer who was inside the nail salon saw Pink and immediately blamed Pink for separating Dyer from his child. Pink responded that Dyer must stop threatening him and Ramsay. Dyer replied, "P*ssyhole, I'm going to kill you." When Pink saw Dyer reach into his waistband for a gun, Pink pulled out his own gun and shot Dyer. Pink fled to get away from Dyer. When he heard the police sirens, Pink did not pull over immediately because he could not find a place to pull over. Before pulling over, Pink threw his gun out of the window because he was scared. After he pulled over, Pink cooperated with police.

The jury found Pink guilty of attempted second-degree murder with a firearm, a lesser included offense of the charged attempted first-degree murder, aggravated battery with a firearm, and fleeing to elude a law enforcement officer. (Doc. 15-3 at 263–65) The trial court sentenced Pink to a mandatory 25 years in prison for the attempted murder and aggravated battery convictions and a concurrent 10 years for the fleeing to elude a law enforcement officer conviction. (Doc. 15-3 at 271–77) The state appellate court affirmed the convictions and sentences. (Doc. 15-3 at 418) The post-conviction court denied Pink's motion for post-conviction relief after an evidentiary hearing (Doc. 15-4 at 100–25), and the state appellate court affirmed. (Doc. 15-4 at 271) Pink's federal petition followed.

## STANDARDS OF REVIEW

### AEDPA

Because Pink filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Pink asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

> errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 691. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the

merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in a decision without a written opinion the post-conviction court's order denying Pink relief. (Doc. 15-4 at 271) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Because the post-conviction court recognized that *Strickland* governed the claims (Doc. 15-4 at 102–03), Pink cannot meet the "contrary to" test in Section 2254(d). Pink instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.

**Ground One**

Pink asserts that trial counsel was ineffective for not adequately impeaching Dyer. (Doc. 5 at 8–9) He contends that trial counsel should have impeached Dyer with "evidence that [Dyer] had an active warrant from New York stemming from a violation of probation, and that he was a wanted felon who worked for the police as a confidential informant." (Doc. 5 at 8) The post-conviction court denied the claim as follows (Doc. 15-4 at 103–06) (state court record citations omitted):

> . . . Defendant alleges that his trial counsel was ineffective for failing to research and prepare for the cross-examination of victim Delroy Dyer. Specifically, Defendant argues that counsel should have been prepared to show that the victim was a "wanted felon who worked for the police as a confidential informant." Defendant alleges that had counsel properly impeached the victim and been able to show the jury the victim's "propensity towards violence," then the "theory of defense would not have been as prejudicial as presented to the jury and [would have] brought about a more favorable verdict."

In response, the State argues that "to the extent that [Defendant] alleges that his counsel was 'unprepared to cross examine Dyer as a wanted felon,'" Defendant's allegation is refuted by the record. Specifically, the States cites to a portion of the record in which the Court heard a proffer of the defense's expected line of cross-examination of the witness and denied it following the defense's presentation.

After reviewing the allegations, the court file, the testimony, and the record, the Court finds that Defendant has failed to demonstrate deficient performance. To gain post-conviction relief based on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that this deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

At the evidentiary hearing, Defendant testified that he informed his counsel that Mr. Dyer "carried a gun" and that he was a confidential informant. According to Defendant, his counsel relayed that she planned to get that information "in" at his trial and that his case was "looking good." When asked how he believed this additional reputation and knowledge of a gun may have affected the outcome of his case, Defendant testified as follows:

| [Pink:] | With everything and the jury would have heard the way I felt with my defense and knowing that, you know, I'm literally scared to go home at night . . . . I'm paranoid because this dude [is] constantly calling my phone, I'm going to kill you when I catch you, I'm going to kill, over and over. It's not just one phone call. This — this has been going on for approximately, I would say, about a year-and-a-half, two years, before the shooting. |

Defendant's lead trial counsel, Ms. Tanya Dugree, testified that she proffered the testimony to the Court prior to trial at a hearing on July 31, 2009. Ms. Dugree further testified that in addition to the oral argument, she also filed a written argument on the same issue highlighting the reasons why this information was important to Defendant's self-defense claim.

After reviewing the allegations, the court file, the testimony, and the record, the Court finds Ms. Dugree's testimony credible. The record reflects that Ms. Dugree did proffer the information Defendant requested at a hearing on July 31, 2009. Further, she filed a response in further support of her argument on August 11, 2009. Following Ms. Dugree's repeated attempts of having the evidence deemed admissible, the Court issued an order on September 8, 2009 in which it prohibited Ms. Dugree from asking Mr. Dyer "whether he is, was, or has been an informant," but did not "preclude any witness from responding to a properly asked question that he or she believed Mr. Dyer is, was, or had been an informant." As such, the Court finds that Defendant has failed to establish that his trial counsel's performance was ineffective as Ms. Dugree attempted to introduce the evidence Defendant alleges would have changed the outcome of his case. Consequently, the Court finds Defendant is not entitled to relief on [the claim].

The post-conviction court found trial counsel credible at the evidentiary hearing, and a state court's credibility determination receives deference on federal habeas. *Raheem v. GDCP Warden*, 995 F.3d 895, 929 (11th Cir. 2021) ("'Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review.'") (quoting *Consalvo v. Sec'y, Dep't Corrs.*, 664 F.3d 842, 845 (11th Cir. 2011)).

At the evidentiary hearing, trial counsel testified about the evidence concerning Dyer's reputation as follows (Doc. 15-4 at 185–86):

| [Prosecutor:] | Okay. Now, address the issue of attempting to present testimony about his — Mr. Dyer's alleged reputation as a known drug dealer, alleged reputation as a C.I., reputation that he carried a gun, that he had done so in connection with the possible intent towards the defendant. Did you attempt to proffer those matters in and get those matters addressed prior to trial? |
| :--- | :--- |
| [Trial counsel:] | There's actually a transcript of it. It happened on July 31st, 2009, in front of Judge Fuente. It was a very rather lengthy |

hearing. I believe it happened as a result of the State filing a motion *in limine*, because I was in constant contact with the State, because we were litigating every issue. There [were] so many motions I lost count, and we did them in front of multiple judges, because for a while we were in front of Judge Pomponio, and then we went back to Judge Fuente. He's the one that gave a final ruling on this issue.

Um, I actually did a written argument on this same issue, and I filed it around August 11th of 2009 with the Court and gave copies to the State, which talks about the reasons that it's important for his self-defense claim to be able to talk about Delroy Dyer as a confidential informant, because the reason he found that he had to arm himself and take the measures that he did is because all the while he had been trying to report it or do something lawfully, and the officer turned a blind eye to it, and so he felt like he had to defend and protect his family and himself.

And part of the reason they were turning a blind eye to it is because he was a confidential informant. So he tried to do the regular course of what he was going to do, and then at that time is when he decided he was going to become armed and carried it around with him for his protection. So it was very relevant, and I did a very long argument with a bunch of case law in it, and I filed it with the Court and with Judge Fuente, and his ruling came out after that date.

[Court:]    What was the date you filed it, you believe?

[Trial counsel:]    I believe it was August 11th, 2009, or maybe one or two days off from that.

[Court:]    Okay.

| [Trial counsel:] | That's the day I gave it to the State. I just checked my emails. |
| [Court:] | Okay. |
| [Prosecutor:] | And it's the — the bottom line is, it's not for lack of trying you didn't present this material[,] you presented it. There was a specific ruling excluding it — |
| [Trial counsel:] | That was on October 15th. |
| [Prosecutor:] | — and, in fact, the defendant appealed that exclusion as part — as part of his appeal in this case? |
| [Trial counsel:] | Yes. I actually wrote the appeal and included that in the appeal. |

At a hearing on July 31, 2009, trial counsel presented argument in response to the prosecution's motion *in limine* to exclude evidence that Dyer was a confidential informant. (Doc. 15-5 at 112–22) After the hearing, the trial court entered an order directing the parties to submit supplemental briefing. (Doc. 15-5 at 84–85) Trial counsel filed a written memorandum arguing that Dyer's identity as a confidential informant was relevant and admissible. (Doc. 15-5 at 92–97) In a written order, the trial court granted the State's motion *in limine* and prohibited trial counsel from asking Dyer about his identity as a confidential informant but ruled that a witness could respond to a properly asked question that "he or she believed that [Dyer] is, was, or had been an informant." (Doc. 15-5 at 178–80)

During trial, trial counsel orally moved for permission to cross-examine Dyer about an active bench warrant for his arrest in New York and the prosecutor objected. (Doc. 15-2 at 130–31) Trial counsel was prepared to cross-examine the victim with a certified copy of the bench warrant. (Doc. 15-2 at 132) The trial court permitted trial counsel to question Dyer

about the bench warrant outside the presence of the jury. (Doc. 15-2 at 132–49) After hearing the proffer, the trial court sustained the prosecutor's objection as follows (Doc. 15-2 at 150):

> [Court:] With respect to the question propounded to this witness: Is he on probation? No. Is he aware of any warrant outstanding? He is not. Did he go to New York and take care of the warrant? He said he went to New York and took care of all his criminal matters. So as far as this witness is concerned and the testimony before this jury is he is not on probation. So I'll sustain the objection. I think you have made your record. . . .

Also, trial counsel asked Pink during his testimony at trial why Pink did not report the death threats by Dyer to police. (Doc. 15-2 at 402–04) Pink testified that he learned that Dyer was a confidential informant. (Doc. 15-2 at 402–04) The prosecutor objected, and the trial court sustained the objection. (Doc. 15-2 at 402, 404)

Because the trial court prohibited trial counsel from impeaching Dyer with both his identity as a confidential informant and the active bench warrant, trial counsel was not ineffective and the state court did not unreasonably apply *Strickland*. *Hunt v. Comm'r, Ala. Dep't Corrs.*, 666 F.3d 708, 723 (11th Cir. 2012) ("'Absent a showing that real impeachment evidence was available and could have been, but was not, pursued at trial, [the petitioner] cannot establish that the cross conducted by his attorneys fell outside the range of professionally competent assistance.'") (quoting *Johnson v. Alabama*, 256 F.3d 1156, 1186 (11th Cir. 2001)); *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Ground One is denied.

**Ground Two**

Pink asserts that trial counsel was ineffective for not impeaching Deneice Ramsay with her renewed relationship with Dyer. (Doc. 5 at 10–11) Before the evidentiary hearing, the post-conviction court denied the claim as follows (Doc. 15-4 at 92–95) (state court record citations and footnote omitted):

> In [this ground] of his original Motion for Post-Conviction Relief, Defendant argues that his trial counsel was ineffective because trial counsel was privy to information that could have been used to impeach State witness Deneice Ramsay, but failed to do so. In particular, Defendant complains about the following exchange which took place during trial counsel's questioning of Ms. Ramsay:

> [Trial counsel:]      Are you back with Mr. Dyer?

> [Ramsay:]      No, we just have a child together.

> Defendant claims that Ms. Ramsay and Mr. Dyer were, in fact, living together, as evidenced by a pre-sentence investigation (PSI) report showing that Ms. Ramsay and Mr. Dyer shared a home address. Defendant asserts that if trial counsel had impeached Ms. Ramsay's testimony with this PSI report, it would have "[discredited] [Ms.] Ramsay's changed testimony suggesting it was a ploy invented by [Ms.] Ramsay and [Mr.] Dyer to [e]nsure the defendant would be convicted." Defendant argues that, had trial counsel impeached Ms. Ramsay with the PSI report, there is a reasonable probability that the outcome of the trial would have been different.

> After reviewing the allegations, the court file, and the record, the Court finds that Defendant is not entitled to relief on the above-stated allegations. The Court begins by noting that a PSI report is usually not prepared until after a defendant is found guilty; and this is true in the instant case. *See* Fla. R. Crim. P. 3.711. Therefore, the suggestion that trial counsel could have impeached Ms. Ramsay using information contained within the PSI is inaccurate. Without some sort of extrinsic evidence or contradictory testimony, trial counsel would have to accept Ms. Ramsay's answer that "we just have a child together." As Defendant's allegations suggest that trial counsel did not become aware that Ms. Ramsay allegedly shared an address with Mr.

Dyer until the PSI report was prepared, it would appear that trial counsel was not, in fact, privy to any special or contradictory information about Ms. Ramsay's living arrangements at the time of her questioning. Accordingly, the Court cannot find counsel's performance deficient.

Further, assuming that trial counsel did have some sort of information with which to impeach Ms. Ramsay on this issue, impeachment on a collateral issue is generally impermissible. *Foster v. State,* 869 So. 2d 743, 745 (Fla. 2d DCA 2004). The test for whether a matter is collateral is whether the proposed impeachment evidence can be introduced for any purpose other than to demonstrate a contradiction. *Mariano v. State,* 933 So. 2d 111, 114 (Fla. 4th DCA 2006). In the present case, it appears that Defendant is arguing that evidence of Ms. Ramsay's address could be used to discredit Ms. Ramsay by showing bias, which is an appropriate use of impeachment evidence. *See generally Jeancharles v. State,* 25 So. 3d 656 (Fla. 4th DCA 2010). However, evidence of Ms. Ramsay's address would not necessarily demonstrate a bias. Even assuming that Ms. Ramsay and Mr. Dyer shared an address at the time of trial, an assumption not supported by any evidence or information introduced at trial, Ms. Ramsay already stated that she was not together with Mr. Dyer and that they shared a child in common. The trier of fact could draw whatever inference of bias they wished from that statement. Evidence that Ms. Ramsay shared an address with Mr. Dyer would not necessarily contradict her statement that they were not in a relationship, nor would it necessarily demonstrate any particular bias. Ms. Ramsay's address is a collateral matter, and it cannot be said that trial counsel would be ineffective for failing to impeach Ms. Ramsay on the issue.

Finally, the Court notes that there is no reasonable probability that evidence of Ms. Ramsay's address would have resulted in a different outcome. Assuming again that Ms. Ramsay did share an address with Mr. Dyer, trial counsel already thoroughly impeached Ms. Ramsay concerning her change in testimony from her original statements given to police and during deposition to the statements she made during trial. The substance of the inconsistent statements for which Ms. Ramsay was questioned by trial counsel concerned matters of actual import to the case, compared to the issue of whether Ms. Ramsay shared an address with Mr. Dyer, which had little, if any, significance. The jury heard the entirety of this impeachment, from which it could have derived that Ms. Ramsay was unreliable or biased, but nonetheless found Defendant guilty. It cannot be said that

there is a reasonable probability that this additional piece of information concerning Ms. Ramsay's address would have changed the outcome of the trial, particularly where significant impeachment on actual relevant issues failed to do so. Consequently, no relief is warranted on [this ground] of Defendant's original motion.

Whether evidence that Ramsay shared an address with the victim concerned a collateral matter is an issue of state law, and a state court's determination of state law receives deference in federal court. Fla. Stat. § 90.608(2). *McClain v. State*, 395 So. 2d 1164, 1165 (Fla. 2d DCA 1981) ("Inquiries into collateral matters should only be allowed when they affect the credibility of the witness."); *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure."). Because evidence that Ramsay shared an address with the victim concerned a collateral matter, trial counsel could not have impeached Ramsay with that extrinsic evidence. *Wilson v. State*, 72 So. 3d 331, 334 (Fla. 4th DCA 2011) ("'It is well-established that if a party cross-examines a witness concerning a collateral matter, the cross-examiner must 'take' the answer, is bound by it, and may not subsequently impeach the witness by introducing extrinsic evidence to contradict the witness on that point.'") (citation omitted).

At the evidentiary hearing, Pink introduced into evidence a document from a wrongful death lawsuit on behalf of Pink and Ramsays' daughter. (Doc. 15-4 at 153–57) The document also showed that Ramsay lived with Dyer at the time of trial. (Doc. 15-4 at 154–55) Because evidence that Ramsay shared an address with the victim concerned a collateral matter, trial counsel could not have impeached Ramsay with the document either. *Wilson*, 72 So. 3d at 334. At the hearing, Pink failed to introduce available evidence that trial counsel could have used to impeach Ramsay concerning her renewed relationship with Dyer. Consequently, Pink failed to prove his claim. *Hunt*, 666 F.3d at 723.

After the evidentiary hearing, the post-conviction court denied an additional related claim as follows (Doc. 15-4 at 106–11) (state court record citations omitted):

> . . . Defendant argues that [the claim] actually includes three sub-claims: (1) ineffective assistance for failing to move the Court for mistrial, (2) ineffective assistance due to counsel's failure to "investigate the facts of the case and learn the truth of the rekindled relationship of defense witness [Ms. Ramsay] and the alleged victim["], and (3) ineffective assistance due to counsel's failure to "expose [Ms. Ramsay's] false testimony that she and [the alleged victim] had not rekindled their romantic relationship between the time [Ms. Ramsay] gave her last deposition and trial." Defendant concedes that the State is correct with regard to the first sub-claim and agrees that the record refutes his allegation that counsel failed to move for mistrial following the discovery violation. However, Defendant argues that because the State failed to respond to sub-claims two and three, he is entitled to an evidentiary hearing on those portions of [the claim].
>
> After reviewing the allegations, the court file, the testimony, and the record, the Court finds Defendant is unable to prove deficient performance or prejudice. At the evidentiary hearing, Defendant testified that he was in a "romantic relationship" with Ms. Ramsay at the time of the shooting. Defendant testified that he became aware of Ms. Ramsay's rekindled relationship with [the victim] "before trial" and that he told [trial counsel] because he believed "it could help [that Ms. Ramsay] was back with [the victim]." When asked whether [trial counsel] took any steps "to investigate whether or not they had rekindled their relationship," Defendant testified as follows:

> [Pink:]            No, she didn't. All she did is tell me that she got the depositions and she cannot testify to nothing more than the depositions, the two depositions, and the recorded statement that she gave to Detective Boswell, I think that's his name, at the time. And I want to bring to the Court that, um, at trial, my attorney, she didn't even have the recorded statement transcribed for trial, and that was important to show that, you know, here's what

she [gave] fifteen — about an hour after the shooting to the detective.

Defendant testified that after he was sentenced, he learned that Ms. Ramsay had been living with Mr. Dyer during his trial. It is Defendant's contention that had [trial counsel] sent an investigator out to investigate the living arrangements, the jury would have known why Ms. Ramsay changed her testimony.

[Trial counsel] testified that she did know about the relationship between Ms. Ramsay and Mr. Dyer. Specifically, [trial counsel] testified as follows:

[Trial counsel:]     Yes, I actually did know. That wasn't what the changed testimony was or what that whole issue was about. [Defendant] told me multiple times, and his family knew[,] everyone knew — everybody. It's a certain type of culture where everyone knew everyone's business. They all talked to each other. They would report it to me. I knew that they were essentially back together. I did a second deposition of her because of it and asked her about that. Um, and — so there was not only one deposition of her; there [were] two.

. . .

[Prosecutor:]     So, again, with regard to the present — presenting this issue, it's not something that came in as a surprise or that you weren't aware of?

[Trial counsel:]     There was a surprise after her testimony, but it wasn't about her being with him.

[Prosecutor:]     And addressing that, the transcript, because, in fact, you did make a motion for a mistrial; the remedy that was given, a *Richardson* hearing was conducted because you moved

for one, and, uh, the remedy was to give you some additional time, and we recessed, I believe, and came back the next day —

[Trial counsel:]  We actually got to call her as a witness a second time, and the judge told the jury, you know, to disregard her testimony or — there was a reason for it. He thought that was the cure, and it is in the transcript. Um, it wasn't that I just wouldn't do anything about that. I pretty much had a fit. I approached the bench. I demanded a mistrial. The judge wouldn't give me a mistrial. I asked for a *Richardson* hearing.

We did a full *Richardson* hearing. The judge actually found it was a discovery violation, but that it was unintentional. So Judge Fuente's remedy was that she would be called as a witness again, and I would be allowed to cross-examine her again, and we recessed. So I was able to get my materials together of all the impeachment that I would need to show on multiple other times you said different things than what you said yesterday. And that's what happened and that's what we did, although I disagreed that that was the proper remedy. We also appealed that issue.

I also included it in a motion for new trial after he was found guilty. Um, that — I can't remember the date of that. I think it was like November 1st that I filed a motion for new trial with a lengthy argument with case law to say that wasn't the proper remedy. It was included in the appeal as well.

After reviewing the allegations, the court file, the testimony, and the record, the Court finds [trial counsel's] testimony credible. The record reflects that [trial counsel] immediately objected at trial following Ms. Ramsay's change in testimony. Specifically, [trial counsel] stated that Ms. Ramsay had been deposed twice, gave two statements to the police, and the information she was providing was not provided in any of those statements. During her direct examination, Ms. Ramsay testified that her statements to the police were untrue and that she provided untrue statements in her depositions. On cross-examination, Ms. Ramsay testified that [the victim] told her, on multiple occasions, that he "was going to kill [Defendant]." [Trial counsel] also impeached Ms. Ramsay with her prior inconsistent statements.

Following Ms. Ramsay's testimony, [trial counsel] moved for a *Richardson* hearing. [Trial counsel] outlined the changes in Ms. Ramsay's testimony and the Court found that while the information was discoverable, the violation was inadvertent. [Trial counsel] moved for mistrial, which the Court denied, but was allowed to recall Ms. Ramsay for further cross-examination. After the State rested, [trial counsel] renewed her motion for mistrial based on the discovery violation and moved for judgment of acquittal, both of which were denied.

The defense also filed "Defendant's Motion for Judgment of Acquittal or Motion for New Trial" on November 2, 2009, in which it argued that the denial of Defendant's motion for mistrial due to the discovery violation entitled Defendant to a new trial.

The Court finds that contrary to Defendant's allegations, [trial counsel] did know of Ms. Ramsay's relationship with [the victim] and deposed her a second time in order to assure that Ms. Ramsay was remaining consistent with regard to her recitation of the facts. As such, Defendant failed to prove that [trial counsel] performed deficiently. Further, Defendant failed to prove that he was prejudiced by [trial counsel's] alleged lack of investigation. The record reflects that while [trial counsel] investigated the relationship between [the victim] and Ms. Ramsay, she did not know of Ms. Ramsay's intention to change her testimony until she took the stand during trial. At that time, [trial counsel] immediately objected, and over the course of the remaining proceedings, moved for a *Richardson* hearing, moved for mistrial, and moved for Judgment of Acquittal. Further, [trial counsel] included argument in the motion for new trial regarding Ms. Ramsay's change in testimony. As such, Defendant is

unable to prove that he was prejudiced by any alleged lack of investigation. Consequently, [the sub-claims] are without merit.

The post-conviction court found trial counsel credible at the evidentiary hearing, and a state court's credibility determination receives deference on federal habeas. *Raheem*, 995 F.3d at 929. The post-conviction court accurately quoted trial counsel's testimony at the evidentiary hearing. (Doc. 15-4 at 187–87) Trial counsel testified that she knew that the victim and Ramsay resumed their relationship before Pink's trial and took a second deposition of Ramsay because of the renewed relationship. (Doc. 15-4 at 187–88)

Pink contends that trial counsel should have impeached Ramsay with the renewed relationship to explain why she changed her recollection of events at trial. (Doc. 5 at 11)

Instead of impeaching Ramsay with why she changed her recollection, trial counsel impeached Ramsay with how she changed her recollection as follows (Doc. 15-2 at 354–58)[1]:

| | |
|---|---|
| [Trial counsel:] | Ms. Ramsay, yesterday for the first time you mentioned that Delroy's car was parked in the parking lot of Top Nail Salon, is that correct? |
| [Ramsay:] | Correct. |
| [Trial counsel:] | You never mentioned that in your two police interviews, correct? |
| [Ramsay:] | Correct. |
| [Trial counsel:] | You never mentioned that in your two depositions where you were deposed under the same oath you took yesterday and today, is that correct? |
| [Ramsay:] | Correct. |

---

[1] Also trial counsel objected to the change in recollection (Doc. 15-2 at 195–97), argued that the prosecutor violated his discovery obligations by not disclosing the change (Doc. 15-2 at 239–40, 313–38), argued that any remedy would not cure the violation and moved for a mistrial (Doc. 15-2 at 330–31), and moved for a new trial because of the discovery violation. (Doc. 15-5 at 221–23)

| | |
|---|---|
| [Trial counsel:] | And further, you also said that Mr. Pink told you that he was going into Top Nail to speak to Delroy; do you remember saying that yesterday? |
| [Ramsay:] | Right. |
| [Trial counsel:] | And that's the first time you ever made that statement, correct? |
| [Ramsay:] | Correct. |
| [Trial counsel:] | And you had multiple times to speak with multiple people you never mentioned it? |
| [Ramsay:] | This time I'm telling the truth. |
| [Trial counsel:] | That's not what I'm asking you. I'm asking if you ever mentioned it prior to yesterday? |
| [Ramsay:] | No, ma'am. |
| . . . | |
| [Trial counsel:] | The fact that Delroy's car was there and you thought Mr. Pink should recognize it, and the fact that you said Mr. Pink told you that he was going in to speak with Delroy, those two statements, you never mentioned them to Mr. State Attorney before yesterday either, did you? Oh, excuse me, prior to Sunday, prior to being prepared for trial on Sunday? |
| [Ramsay:] | No. Sunday was the first we had those conversations. |
| [Trial counsel:] | Thank you. My mistake. And also something that you spoke of yesterday was you said Mr. Pink said to you in the vehicle right after the incident something to the effect of: If you want a father for your child you better do what you need to do and say what I need you to say, basically lie for him and say it's self-defense, correct, do you remember saying that? |

| [Ramsay:] | Correct. |
|---|---|
| [Trial counsel:] | Now, that was the first time you ever said that, correct? |
| [Ramsay:] | I said it to Mr. Falcone — |
| [Trial counsel:] | On Sunday. Other than trial preparation for this case the Sunday before trial — |
| [Ramsay:] | It's been awhile and everything started coming back to me. It's been two years. I didn't remember every single incident. |

Trial counsel's approach proved successful. Ramsay's change in recollection of events supported the attempted first-degree murder charge. The information charged Ramsay with attempting commit murder with a "premeditated design to effect death." (Doc. 15-2 at 3) Premeditation is "more than a mere intent to kill" and instead "a fully formed conscious purpose to kill." *Dubose v. State*, 210 So. 3d 641, 653 (Fla. 2017) (citation omitted). Ramsay changed her recollection and testified that, just before Pink shot Dyer, Pink both saw the Dyer's car in the parking lot of the nail salon and told Ramsay that he planned to enter the nail salon to speak with Dyer. (Doc. 15-2 at 354–58) Ramsay's change in testimony tended to prove that Pink knew Dyer was in the salon and had a "a fully formed conscious purpose to kill" when he entered the salon with a gun. *Dubose*, 210 So. 3d at 653.

However, trial counsel impeached Ramsay by showing the jury that she had omitted these material inculpatory statements from both her earlier statements to police and her deposition. *Hawn v. State*, 300 So. 3d 238, 242 (Fla. 4th DCA 2020) ("'[A]n omission in a previous out-of-court statement about which the witness testifies at trial' can be considered an inconsistent statement for impeachment purposes, if the omission is a 'material, significant fact rather than mere details and would naturally have been mentioned.'") (citation omitted);

*Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) ("The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements.").

During closing argument, trial counsel relied on these material omissions to argue that Ramsay was untruthful. (Doc. 15-3 at 183–84, 191–92) The jury rejected Ramsay's change in recollection, acquitted Pink of attempted first-degree murder, and found him guilty of attempted second-degree murder, a lesser included offense. (Doc. 15-3 at 263) The jury found that Pink did not have a premeditated intent to kill. Fla. Stat. § 782.04(2) ("The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, **although without any premeditated design to effect the death of any particular individual**, is murder in the second degree . . . .") (bolding added). Because trial counsel's approach proved successful, the state court did not unreasonably apply *Strickland*.

For self-defense, the defense bore the burden of proving that Pink "reasonably believe[d] that using or threatening to use [deadly force] [was] necessary to prevent imminent death or great bodily harm to himself." Fla. Stat. § 776.012(2). Dyer's reputation for violence was relevant to show that Pink reasonably held that belief. *Mohler v. State*, 165 So. 3d 773, 775 (Fla. 2d DCA 2015) ("Reputation evidence of the victim is admissible as circumstantial evidence to prove that the victim acted consistently with his or her reputation for violence.").

On cross-examination, trial counsel elicited from Ramsay that she and Dyer fought when they were in a relationship (Doc. 15-2 at 210) and she obtained a restraining order against Dyer because she needed to protect herself and Pink from Dyer's death threats. (Doc. 15-2 at 205–06) During closing argument, trial counsel reminded the jury that Ramsay

admitted that she was afraid of Dyer, obtained a restraining order against him, and reported Dyer's threats to police. (Doc. 15-3 at 178–79) Trial counsel would not have impeached Ramsay with her renewed relationship with Dyer because that impeachment would have undermined this other evidence that supported Pink's claim of self-defense. For that reason as well, the state court did not unreasonably apply *Strickland*. *Hunt*, 666 F.3d at 724 ("'There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.'") (quoting *Richter*, 562 U.S. at 109).

Ground Two is denied.

## Ground Three

Pink asserts that trial counsel was ineffective for not advising him to accept the plea offer of 10 years in prison knowing that a defense of self-defense would not have succeeded. (Doc. 5 at 13) He further asserts that trial counsel was ineffective for not advising him that he faced a 25-year mandatory minimum term if the jury found him guilty at trial. (Doc. 5 at 13) He contends that he would have accepted the plea offer if he had known that Ramsay planned to testify differently than her deposition testimony because that change in the testimony undermined his defense. (Doc. 5 at 13–14) He asserts that the change in Ramsay's recollection rendered his rejection of the plea unknowing and involuntary. (Doc. 5 at 14)

The post-conviction court denied the claim as follows (Doc. 15-4 at 118–23) (state court record citations omitted):

> . . . Defendant makes two allegations: (a) that trial counsel was ineffective for failing to advise Defendant to accept a plea offer where it could be determined that Defendant could not achieve an acquittal; and (b) that trial counsel was ineffective for failing to advise Defendant of the potential sentences Defendant faced in the event of a guilty verdict. In particular, Defendant alleges that the State initially offered Defendant a ten-year sentence in exchange for a guilty plea which Defendant acknowledges "may

not have appeared attractive at the time" but which he should have been encouraged to accept in light of "the volume of evidence against" Defendant. Defendant further alleges that counsel failed to properly advise Defendant that he faced a 25-year mandatory minimum sentence. Defendant claims that, but for trial counsel's misadvice, he would have accepted the plea offer rather than proceed to trial.

In response, the State concedes that "an evidentiary hearing will need to be conducted concerning the advice given by Defendant's counsel to him concerning the statutory maximums."

To be granted relief on a claim of ineffectiveness with regard to a plea offer, a defendant must prove that "(1) counsel failed to communicate a plea offer or misinformed defendant concerning the penalty faced, (2) defendant would have accepted the plea offer but for the inadequate notice, and (3) acceptance of the State's plea offer would have resulted in a lesser sentence." *Murphy v. State*, 869 So. 2d 1228, 1229 (Fla. 2d DCA 2004) (quoting *Cottle v. State*, 733 So. 2d 963, 967 (Fla. 1999)). Here, the Court finds that Defendant failed to meet his burden.

At the evidentiary hearing, Defendant testified as follows with regard to discussions he had with [his] attorneys about the plea offer:

| [3.850 Counsel:] | [D]uring those meetings with Ms. Dugree and Mr. Parrocha toward the end, did you have discussions about offers or making an offer to the State? |
|---|---|
| [Pink:] | Yes. |
| [3.850 Counsel:] | Okay. And what — what were those discussions — the substance of those discussions? |
| [Pink:] | They, uh — before trial, they came to me with, uh, ten years plea deal, I think it was, mandatory. |
| [3.850 Counsel:] | Okay. And did you have a meaningful discussion about that offer? |

| | |
|---|---|
| [Pink:] | He just asked me, you know, what do you want to do. Uh, Mr. Parrocha came out. He asked me, what do you want to do, and I told him, I said, um, you know, I want to go to trial at the time, you know. So he said, okay, just reject the plea and we'll go to trial, and I signed the paper. And the meeting, just like I said, when he came out, it wasn't that long because he just basically came out there about the plea. |
| [3.850 Counsel:] | Okay. Now, during the course of these meetings, did you discuss the minimum mandatory sentencing that was required under this? |
| [Pink:] | No. We never got into minimum mandatory because all she ever talk[ed] about is you [are] facing a [felony punishable by life], and, uh, once you — when the — the charge on [the victim], you're automatic when the case on Ms. Vicky Brown, because it's a transfer [of] intent. So we never really got into a minimum mandatory on the other lesser include[d]s or nothing like that. |
| [3.850 Counsel:] | So there was never any discussion about — |
| [Pink:] | No. |
| [3.850 Counsel:] | — what the minimum mandatory sentence[ ] was? |
| [Pink:] | No. She never — she never explained that to me, no. |
| [3.850 Counsel:] | Going into trial, did the Court or anybody else explain to you what minimum mandatory sentencing was? |

| | |
|---|---|
| [Pink:] | No, they never did. |

. . .

| | |
|---|---|
| [3.850 Counsel:] | Now, prior to trial, did you receive an offer from the State? |
| [Pink:] | Yes, sir. |
| [3.850 Counsel:] | And what was that offer? |
| [Pink:] | It was ten years. |
| [3.850 Counsel:] | Okay. And did you discuss that offer with your attorney? |
| [Pink:] | Yes, sir. |
| [3.850 Counsel:] | And if you would have known about the lesser offenses that you could have been convicted of short of the attempted first-degree murder, do you believe you would have accepted that offer? |
| [Pink:] | Yes, I would. |
| [3.850 Counsel:] | And was the offer available up — to you up until the time of jury selection? |
| [Pink:] | Yes. Yes, it was. |
| [3.850 Counsel:] | And if you would have known that you faced minimum mandatory time on lesser offenses, would you have accepted that ten-year offer then? |
| [Pink:] | Yes, I would. |
| [3.850 Counsel:] | Okay. At some time during trial, did you attempt to offer ten years to the State? |

| | |
|---|---|
| [Pink:] | Yes. |
| [3.850 Counsel:] | And why was that? |
| [Pink:] | Uh, when, uh Deneice Ramsay got up on the stand and totally changed her theory, and, uh, Ms. Tanya — Tanya Dugree telling me there's nothing she could do, I say, okay, ask the State — okay, I'll take the ten-year plea, because now the change of testimony and everything is going to hurt me, you know. Ask the State if I can get the ten-year plea also. And, uh, they went over and they talked to the State, and he said no at that point. |

Mr. Parrocha testified that he met with Defendant five or six times and during the course of his discussions with Defendant, he discussed the minimum mandatory associated with his charges. Specifically, Mr. Parrocha testified as follows:

| | |
|---|---|
| [Prosecutor:] | Okay. So, specifically, did you advise the defendant in this case that he was looking at twenty-five year minimum mandatories up to life on the attempted murder — |
| [Parrocha:] | Yes. |
| [Prosecutor:] | — charge. |
| [Parrocha:] | Yes. |
| [Prosecutor:] | And twenty-five years to thirty years on the aggravated battery? |
| [Parrocha:] | Yes. |
| [Prosecutor:] | Okay. Based on your conversation with him, did he understand that? |
| [Parrocha:] | Yes. |
| [Prosecutor:] | And that was before the trial? |

| | |
|---|---|
| [Parrocha:] | Yes. |
| [Prosecutor:] | Now, also before trial, did you discuss with him the plea offer — |
| [Parrocha:] | Yes. |
| [Prosecutor:] | — that the State had proposed for ten years in Florida State Prison? |
| [Parrocha:] | Yes, I did. That was on October 18th, and I went to see him to discuss the offer of ten years. |
| [Prosecutor:] | And what was his position with regard to that? |
| [Parrocha:] | He rejected the offer. He wanted three years [of] probation or a suspended sentence. |
| [Prosecutor:] | And, again, this was on a case where he'd been specifically advised this is a twenty-five year minimum mandatory, correct? |
| [Parrocha:] | Yes, sir. |
| [Prosecutor:] | Okay. Was it his decision and his alone to go to trial? |
| [Parrocha:] | Yes. |

Ms. Dugree also testified as to the discussions she had with Defendant regarding the plea offer and minimum mandatory sentence. Specifically, she testified as follows:

| | |
|---|---|
| [Prosecutor:] | Prior to the commencement of trial, did you have occasion to discuss the minimum mandatories with Mr. Pink that he was facing in this case? |
| [Dugree:] | Multiple times because the gun law I would explain to him 10/20/Life and that he was facing a [felony |

punishable by life], which he said today he knew he was facing a [PBL], which is a possibility of life offense, and that when a gun is used, what — if it's used and if it's fired, if there's an injury or if there's death, and each mandatory minimum that applies to it. In fact, when he got the offer, I begged him to take the offer, and he did not want to take it . . . .

Ms. Dugree testified that she met with Defendant "well over twenty times" and that once the ten year offer was on the table, they discussed whether they should risk a mandatory minimum because "essentially we were admitting it happened by doing a justification defense. So there was no lesser included or anything to that effect, because with a self-defense claim, which we — we talked about from the very beginning, is that you are admitting it happened and you're saying that you were justified in protecting your life." Ms. Dugree testified that it was "absolutely" Defendant's knowing decision to go to trial.

After reviewing the allegations, the court file, the testimony, and the record, the Court finds Mr. Parrocha and Ms. Dugree's testimony to be more credible than that of Defendant. Defendant testified that both of his attorneys communicated and discussed the ten-year plea offer with him prior to trial. Further, both attorneys testified that they both, on multiple, separate occasions, discussed both the plea offer and the associated minimum mandatories. As such, neither Mr. Parrocha nor Ms. Dugree can be said to have performed below an objective standard of reasonableness nor did either of the attorneys perform unreasonably under professional norms. Therefore no relief is warranted on [the claim].

The post-conviction court found trial counsel credible at the evidentiary hearing, and a state court's credibility determination receives deference on federal habeas. *Raheem*, 995 F.3d at 929. The post-conviction court accurately quoted testimony by trial counsel at the evidentiary hearing. (Doc. 15-4 at 176–77, 183–84) Both trial counsel testified that they discussed with Pink the 25-year mandatory minimum term for the firearm enhancement.

(Doc. 15-4 at 176–77, 183–84) Parrocha testified that Pink would only accept an offer of three years of probation or a suspended sentence. (Doc. 15-4 at 176) Dugree testified that she "begged him to take the offer" but Pink would not accept the offer. (Doc. 15-4 at 184)

Dugree further testified that she met with Pink to discuss self-defense as follows (Doc. 15-4 at 184–85):

| [Prosecutor:] | How many different times did you meet with him generally in terms of case preparation or prior to — |
|---|---|
| [Trial counsel:] | Well over twenty times. I don't know the exact amount but even, um — each time [sentencing] would come up [ ] because it was always — always a relevant factor because at first we didn't get an offer. When we finally got an offer — it wasn't an offer — he would receive, I think, it was twenty years or something to that effect. So that, you know, he wasn't going to accept it, especially because he felt justified it was a self-defense case — |

. . .

| [Prosecutor:] | What discussions did you have with him about the plea offer, and specifically, the ten-year offer? |
|---|---|
| [Trial counsel:] | Once it became a ten-year offer, that's when we had to start thinking do you want to risk a mandatory minimum if you're sentenced, because essentially we were admitting it happened by doing a justification defense. So there was no lesser included or anything to that effect, because with a self-defense claim, which we — we talked about from the very beginning, is that you are admitting it happened and you're saying that you were justified in protecting your life. And that was always the defense, and the reason that the ten years was something we talked about, and |

| | the mandatory minimum, if we were doing a comparative analysis. |
| | |
| | Ten years you know you can go home, you have a wife, you have — I think he has five children, has many children, and he had a wife that he was still with at the time. And then also if you risk it, there's this mandatory minimum, which you — which you face day for day, no gain time. So there was a very long discussion about it and multiple times. |
| [Prosecutor:] | And is it clear from your conversation with him that it was his decision — his knowing decision to go forward to trial in light of that? |
| [Trial counsel:] | Absolutely. |

The prosecution charged Pink with attempted first-degree murder and aggravated battery. (Doc. 15-2 at 2–5) The information alleged that Pink actually possessed a firearm during the commission of both crimes and discharged the firearm causing great bodily harm. (Doc. 15-2 at 2) For this firearm enhancement, Pink faced a mandatory minimum term of 25 years in prison if convicted of either crime, or the necessary lesser included offense of attempted second-degree murder. Fla. Stat. § 775.087(2)(a)(3).

The mandatory minimum for the firearm enhancement does not apply to attempted manslaughter by act, another necessary lesser included offense of attempted first-degree murder. *Brown v. State*, 83 So. 3d 777, 778 (Fla. 5th DCA 2011) ("Under section 775.087(2), attempted voluntary manslaughter is not an enumerated offense subjecting an offender to its mandatory minimum provisions."). Attempted manslaughter by act requires proof that the defendant intended to commit an act that caused the death of the victim, instead of proof that the defendant intended to kill the victim. *Daniels v. State*, 121 So. 3d 409, 414–15 (Fla. 2013)

(quoting *State v. Montgomery*, 39 So. 3d 252, 256 (Fla. 2010)). By asserting self-defense, Pink conceded that he intended the kill the victim. *Saldana v. State*, 139 So. 3d 351, 353 (Fla. 2d DCA 2014). Consequently, trial counsel was not ineffective for advising Pink that, if he asserted self-defense, a lesser offense without a mandatory minimum did not apply. (Doc. 15-4 at 184–85)[2]

Ramsay's change in her recollection of the events occurred during trial. Pink testified that the prosecution's plea offer of 10 years was available until jury selection commenced. (Doc. 15-4 at 162–63) Trial counsel was surprised by the change, could not have anticipated the change, and could not have advised Pink to plead guilty before jury selection because of the change. *Strickland*, 466 U.S. at 689.

Also, Pink testified that he asked trial counsel to present a 10-year offer to the prosecutor after Ramsay's change in recollection. (Doc. 15-4 at 163) Trial counsel extended the offer but the prosecutor rejected the offer. (Doc. 15-4 at 163) Consequently, Pink could not demonstrate prejudice. *Missouri v. Frye*, 566 U.S. 134, 148 (2012) ("In order to complete a showing of *Strickland* prejudice, defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented.").

---

[2] Also the mandatory minimum does not apply to battery, a necessary lesser included offense of aggravated battery. Fla. Stat. § 775.087(2)(a)(1). The information charged Pink with causing great bodily harm, permanent disability, or permanent disfigurement for the aggravated battery charge. (Doc. 15-2 at 3) Because unrebutted evidence at trial proved that the bullet struck the woman in the salon, pierced her arm and neck, and inflicted a permanent scar (Doc. 15-2 at 53–54, 56, 303), trial counsel was not ineffective for advising Pink that the lesser offense of battery did not apply.

Lastly, Pink asserts that trial counsel was ineffective for not presenting an expanded motion for mistrial for the discovery violation. (Doc. 5 at 14) He contends that trial counsel should have argued that Ramsay's change in recollection procedurally prejudiced the defense because Pink would have accepted the prosecution's 10-year offer if he had known about the change before trial. (Doc. 5 at 14) At sentencing, trial counsel presented this argument as part of a motion for new trial as follows (Doc. 15-3 at 306–07):

> [Trial counsel:] You got to remember, Your Honor, that during the two depositions she changed her testimony. At what point in time did this defendant allegedly make these statements? In our case in chief, there was one witness to the case, the nanny, Charmaine Sealey, who went to the fish store, was dropped off because she was going to buy fish before the shooting occurred. I mean, we would have examined her had we found out about these statements. At what point in time did this defendant allegedly make these statements? Then we would have prepared for it. And in the defendant's words, Your Honor.
>
> I mean, how was our trial strategy affected? Perhaps we would never have gone to trial had we learned about this. The defendant would have accepted the ten-year offer. And that's exactly what he indicated to me when I went to see him. Had I known, Mr. Parrocha, those statements are going to come out at trial there would be no trial because I would have accepted the ten years. . . .

After the prosecutor responded to the argument, the trial court denied the motion for new trial. (Doc. 15-3 at 310–13) Because the record refutes that trial counsel deficiently performed

and the outcome at trial would not have changed, the state court did not unreasonably apply *Strickland*.

Ground Three is denied.

Accordingly, it is **ORDERED** that Pink's amended petition (Doc. 5) is **DENIED** because all claims in the petition are without merit. The Clerk is **DIRECTED** to enter a judgment against Pink and **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Pink neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on July 13, 2021.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE